FILED

2011 Dec-01  AM 09:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BARONICA WARREN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:08-CV-223-VEH** |
| | ) | |
| **THE  COUNTY  COMMISSION  OF** | ) | |
| **LAWRENCE COUNTY, ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## MEMORANDUM OPINION

This matter is before the Court on the following post-trial Motions: the Defendant's Motion for a New Trial (Doc. 217) ("Motion for New Trial"), filed pursuant to Rule 59 of the Federal Rules of Civil Procedure; and the Plaintiff's Motion for Equitable Relief (Doc. 206) ("Motion for Equitable Relief"), which seeks an award of front pay. The parties have fully briefed the Motions, and they are now under submission. The Court has carefully considered the Motions and all exhibits thereto, the applicable law, and the trial testimony and evidence in this case, and has determined that the Motion for New Trial is due to be **DENIED IN PART** to the extent it seeks a new trial and **GRANTED IN PART** to the extent it alternatively seeks remittitur pursuant to the applicable statutory cap. Further, the Motion for

Equitable Relief is due to be **GRANTED** as set out below.

## I.    INTRODUCTION

Plaintiff Baronica Warren ("Ms. Warren" or "Plaintiff") filed claims against the Defendant County Commission of Lawrence County, Alabama[1] (the "Commission" or "Defendant") for unpaid overtime and for retaliation.   (*See* 2d Am. Complt., Doc. 34 at 26-27, 28-29; Pretrial Order, Doc. 180 at 9, 16).   In one count, Ms. Warren alleged she was denied payment in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*., of earned overtime she accrued while employed by the Commission.   The other count is a claim that Ms. Warren was retaliated against by the Commission in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, *et seq.*, as amended by the Civil Rights Act of 1991.   These claims were tried before a jury from June 13, 2011, to June 16, 2011.

Ms. Warren prevailed on both her FLSA and Title VII claims.   The jury rendered a verdict of $450.64 in favor of Ms. Warren and against the Commission as to Ms. Warren's FLSA claim for overtime compensation.   (Doc. 203 at 1).   Further, on Ms. Warren's Title VII retaliation claims, the jury rendered a verdict awarding her

---

[1]   Although Ms. Warren initially sued multiple Defendants, the Commission was the only remaining Defendant by the time the case proceeded to trial, as the claims involving the other named Defendants were dismissed on various grounds at the dispositive motions stage.   (*See generally* Doc. 87; *see also* Doc. 176 n.1).

$330,000.00 as compensation for her emotional pain and mental anguish,[2] as well as $70,600.00 for her lost pay and benefits, which equaled a total award of $400,600.00 on her retaliation claims.  (Doc. 203 at 2-5).  Consistent with the jury verdict, the Court entered a Partial Final Judgment in favor of Ms. Warren and against the Commission in the amount of $400,600.00 on her retaliation claims, and $901.28 on her FLSA claim, of which $450.64 was awarded as unpaid compensation, and $450.64 was awarded as liquidated damages.  (Doc. 208).

Following the trial, the parties submitted the Motions that are now pending before the Court.  Defendant's Motion for a New Trial (Doc. 217) contains an alternative request for remittitur based on the 42 U.S.C. § 1981a(b)(3) statutory cap, and Plaintiff's Motion for Equitable Relief (Doc. 206) seeks front pay.  The Court held a telephone conference with the parties on October 3, 2011, to discuss issues pertaining to Defendant's request to reduce the jury verdict pursuant to the mandatory statutory cap.  That conference resulted in the Court's re-opening of discovery limited to one issue relating to application of the cap, and the setting of an evidentiary hearing for December 6, 2011.  (See Order, Doc. 228).  Subsequently, the parties filed

---

[2]  The $330,000.00 jury verdict on Ms. Warren's claim for compensatory damages broke down as follows: "$73,000.00 as compensatory damages for the vote to investigate; $90,000.00 for the investigation itself; $83,500.00 for the hearing, and $83,500.00 for her termination." (Doc. 217 at 1; see also Doc. 203).

3

a Joint Stipulation (Doc. 231) agreeing to application of the cap, obviating the need for further discovery, and the Court accordingly cancelled the evidentiary hearing.

The only matters left pending before the Court, therefore, are the Motion for New Trial and Motion for Equitable Relief.  The Court will address each in turn.

## II.  COMMISSION'S MOTION FOR NEW TRIAL

### A.    Request for New Trial

The Commission first asks the Court to grant a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure.  (Doc. 217 at 1).  However, nowhere in its Motion for a New Trial does the Commission set out the legal standard for a new trial under Rule 59.  Rule 59(a) provides that, following a jury trial, the court "may, on motion, grant a new trial on all or some of the issues–and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."   Fed. R. Civ. P. 59(a)(1)(A).  The only reason for granting a new trial presented in the Commission's Motion relates to the "excessive" verdict for the compensatory damages awarded by the jury on Ms. Warren's retaliation claims relating to her emotional pain and suffering.  (*See* Doc. 217 at 1).

Although the district court has discretion to grant a new trial where the excessiveness of a jury verdict is challenged, the Eleventh Circuit adheres to an exceedingly high standard for granting a new trial on those grounds:

It is true that a grossly excessive award may warrant a finding that the jury's verdict was swayed by passion and prejudice and thus necessitate a new trial. *See Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 283 (5th Cir. 1975). However, a new trial should be ordered only where the verdict is ***so excessive as to shock the conscience of the court***. *Thompson v. National Railroad Passenger Corp.*, 621 F.2d 814, 827 (6th Cir.), *cert. denied*, 449 U.S. 1035, 101 S. Ct. 611, 66 L. Ed. 2d 497 (1980); *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1085 (D.C. Cir. 1974); *Massachusetts Bonding & Insurance Co. v. Abbott*, 287 F.2d 547, 548 (5th Cir. 1961). Whether a new trial is required is within the sound discretion of the district court, and a refusal to grant a new trial will not be overturned unless there has been a clear abuse of discretion. *Hedrick v. Hercules, Inc.*, 658 F.2d 1088, 1095 (5th Cir., Unit B, 1981).

*Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447-48 (11th Cir. 1985) (emphasis added).[3] Neither in its initial Motion for New Trial nor its Reply brief to the Plaintiff's opposition to its Motion does the Commission argue that "the verdict is so excessive as to shock the conscience of the court." *See id.* Because the Commission provides *no* factual or legal basis upon which the Court could conclude that the verdict is so excessive as to "shock the conscience of the court," the Commission's Motion for New Trial (Doc. 217) is due to be **DENIED** to the extent that it requests a new trial.

## B.    Alternative Motion for Remittitur

Although not styled as such, the Commission's Motion for New Trial

---

[3]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

alternatively contains a Motion for Remittitur, stating: "The court may also allow a plaintiff to avoid a new trial by agreeing to remit the excessive portion of the damages awarded her."  (Doc. 217 at 2, citing *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1328 (11th Cir. 1999)).[4]  Specifically, the Commission seeks a reduction in the amount of compensatory damages awarded pursuant to the applicable statutory cap on compensatory damages.  (Doc. 217 at 3 (requesting a reduction from $330,000.00 to $50,000.00 based on application of the statutory cap).[5]

The amount of compensatory damages recoverable by prevailing plaintiffs in intentional discrimination cases, including Title VII employment discrimination, is limited by the statutory framework set out in 42 U.S.C. § 1981a(b)(3).  *See U.S. E.E.O.C. v. W&O, Inc.,* 213 F.3d 600, 612-14 (11th Cir. 2000) (applying the Section 1981 statutory cap to plaintiff's recovery on Title VII claims).  That statute limits recovery of compensatory and punitive damages based on the number of employees employed by the defendant-employer during a designated time period as follows:

---

[4]   The Commission's post-trial request for remittitur is governed by Federal Rule of Civil Procedure 59(e).  "Motions to alter or amend a judgment under Rule 59(e) are granted only if there is newly discovered evidence or manifest errors of law or fact."  *Henderson v. Sec'y, Fla. Dep't of Corr.*, No. 10-14453, 2011 WL 4375036, at *1 (11th Cir. Sept. 21, 2011) (slip opinion).

[5]   The Commission's Motion also initially requested a further reduction from $50,000 (after application of the statutory cap) to $7,500 based on the discretionary reduction applied in the non-binding authority of *Johnson v. Stone Container*, 88 F. Supp. 2d 1295, 1298-99 (N.D. Ala. 2000), but that request has also been withdrawn. (Doc. 231, Joint Stipulation, p.2, ¶ 2).

(3) Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party--

(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

(B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and

(C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

42 U.S.C. § 1981a(b)(3).

The cap applies to each individual prevailing plaintiff, rather than to each individual claim. *See* 42 U.S.C. § 1981a(b)(3); *Hudson v. Chertoff*, 473 F. Supp. 2d 1286, 1289 (S.D. Fla. 2007) (agreeing with the analysis and decisions of the Sixth, Seventh, and Tenth Circuits that "the statutory cap applies to each action rather than each claim"). Further, the cap is for the Court, not the jury, to apply; the statute expressly forbids the Court from informing the jury of the statutory limitations on

recovery before deliberations.  *Id.* § 1981a(c)(2).[6]  By necessity, therefore, the cap

comes into play only *after* the jury awards its verdict.  *See Parrish v. Sollecito,* 280

F. Supp. 2d 145, 155 (S.D.N.Y. 2003) ("The statutory cap is properly excluded from

jury instructions, and only after a verdict is submitted, the trial court must ensure that

any award complies with the relevant statutory maximums applicable.").

In this case, neither party contests applicability of the cap, and the parties

jointly stipulated to the following:

> During the calendar years 2007 and/or 2008, Defendant employed more
> than 100 and fewer than 201 employees.  Therefore, the Parties stipulate
> and agree that, pursuant to 42 U.S.C. § 1981a(b)(3)(B), <u>the total amount
> of compensatory damages that may be recovered by Plaintiff in this
> action for emotional distress and mental anguish should be capped at
> $100,000.00</u>.

(Doc. 231 at ¶ 1) (emphasis added).  Accordingly, Defendant's alternative Motion for

Remittitur is due to be **GRANTED IN PART** to the extent that the jury's verdict

awarding $330,000 as compensatory damages for emotional pain and mental anguish

relating to Ms. Warren's Title VII retaliation claims will be reduced to $100,000

based on the statutory cap.

---

[6]  The legislative history reflects the purpose of not advising the jury about the statutory
cap, which is to ensure that "no pressure, upward or downward, will be exerted on the amount of
jury awards by the existence of the statutory limitations." 137 Cong. Rec. S15,484 (daily ed. Oct.
30, 1991) (statement of Sen. John Danforth).

## III.  MOTION FOR EQUITABLE RELIEF

In her Motion for Equitable Relief, Ms. Warren requests that this Court award her equitable relief in the form of front pay.[7]  (Doc. 206).  The decision to award equitable relief is within the sound discretion of the trial court, *Goldstein*, 758 F.2d at 1448, provided that it is "guided by sound legal principles," *Albemarle*, 422 U.S. at 416.  The Court has determined that front pay is appropriate in this case.  The following is a "careful[] articulat[ion] of [the] rationale" behind its decision.  *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) (citations omitted).

### A.    Title VII Presumptively Entitles Prevailing Plaintiffs to Reinstatement or Front Pay

As the Supreme Court has noted, the principal purpose of Title VII is "to achieve equality of employment opportunity" by giving employers incentives "to self-examine and self-evaluate their employment practices and to endeavor to eliminate, so far as possible," employment discrimination.  *Albemarle Paper*, 422 U.S. at 417-18 (internal quotations and citations omitted).  "To accomplish this purpose, the statute 'vests broad equitable discretion in the federal courts,' to fashion the 'most complete relief possible.'"  *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515,

---

[7]  The Supreme Court has expressly determined that an award of front pay is *not* subject to the 42 U.S.C. § 1981a(b)(3) statutory cap.  *Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 848 (2001) ("[W]e conclude that front pay is not an element of compensatory damages within the meaning of § 1981a, and, therefore, we hold that the statutory cap of § 1981a(b)(3) is inapplicable to front pay.").

1528 (11th Cir. 1991), *superceded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071.  (citations omitted).  Accordingly, in light of Title VII's goal of making the prevailing plaintiff "whole" and restoring her to the economic position she would have occupied but for the employer's illegal discrimination, the Eleventh Circuit recognizes that "[i]n addition to back pay, prevailing Title VII plaintiffs are <u>presumptively entitled to either reinstatement or front pay</u>." *Id*. at 1528.  Reinstatement is the preferred remedy, as it "offers the most likely means of making a plaintiff whole by allowing her to continue her career as if the discrimination had not occurred." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1338 (11th Cir. 1999); *see also Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1473 (11th Cir. 1985) (holding that prevailing Title VII plaintiffs are "presumptively entitled to reinstatement under the 'make whole' policy." (citing *Darnell v. City of Jasper*, 730 F.2d 653, 655 (11th Cir. 1984)).

"Nonetheless, reinstatement is not always required.  In situations where 'discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy,' a court may consider an award of front pay in lieu of reinstatement." *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d 1240, 1281 (N.D. Ala. 2006) (quoting *Goldstein*, 758 F.2d at 1449).  The Eleventh Circuit recognizes multiple factors relevant to a court's determination of whether

10

reinstatement is an appropriate remedy:

> In deciding whether to award front pay, rather than reinstatement, courts look to whether "'discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy,'" *Lewis v. Federal Prison Indus.*, 953 F.2d 1277, 1280 (11th Cir. 1992) (quoting *Goldstein v. Manhattan Indus.*, 758 F.2d 1435, 1449 (11th Cir. 1985)), the "'defendant's management [had] intimidated or threatened'" the plaintiff, *id.* (quoting *Eivins v. Adventist Health Sys.*, 660 F. Supp. 1255, 1263 (D. Kan. 1987)), or the termination had harmed the plaintiff's emotional well-being, *id.*

*W&O, Inc.,* 213 F.3d at 619.  Courts may also consider "extenuating circumstances," *see id.*, such as whether any vacancy exists in the position considered for reinstatement. For instance, in *Tucker*, Judge Proctor determined: "This court agrees with other courts that have found reinstatement (or instatement, for that matter) inappropriate in situations where there is no vacancy in which to place the plaintiff or where an incumbent employee must be discharged to accomplish the reinstatement."  507 F. Supp. 2d at 1281.

## B.     Reinstatement Not Appropriate

The Eleventh Circuit "require[s] that a trial court 'carefully articulate' its reasons for awarding front pay in lieu of reinstatement.'" *W&O, Inc.,* 213 F.3d at 619 (quoting *Farley*, 197 F.3d at 1339).  Here, the parties agree that the Title VII remedy of reinstatement is not possible because there is no comparable open position for Plaintiff to fill.  (Doc. 212 ("As an initial matter, the Commission agrees that

reinstatement is inappropriate in this action.")).   As explained in Ms. Warren's Motion for Equitable Relief:

> Plaintiff previously held the position of Payroll Clerk with Defendant. Currently, that position is held by Mechelle Graham. Therefore, the position Plaintiff held prior to her wrongful termination is not vacant. It would not be appropriate to have Ms. Graham terminated in order for Plaintiff to be placed in that position. Also, Defendant should not be required to create an additional position to its office staff when one is not warranted.

(Doc. 206 at 3-4).  Moreover, the Court finds that potential "discord and antagonism between the parties would render reinstatement ineffective," *Goldstein*, 758 F.2d at 1449, considering that one of the Commissioners who testified against the Plaintiff at trial continues to be employed with the County; the potential for resentment and an antagonistic atmosphere in the workplace following the negative publicity surrounding this lawsuit and trial; and Plaintiff's relationship with her brother-in-law, who is now a Commissioner, which could create the appearance of a conflict of interest if Plaintiff were to be reinstated.  (*See* Doc. 206 at 4).  For all these reasons, reinstatement in this case is not appropriate.

## C.   Front Pay Considerations

Accordingly, the Court must consider the  option of front pay as a "substitute" for reinstatement, as discussed by the Supreme Court:

> Courts recognized that reinstatement was not always a viable option, and

> that an award of front pay as a substitute for reinstatement in such cases
> was a necessary part of the "make whole" relief mandated by Congress
> and by this Court in *Albemarle*. *See, e.g., Shore v. Federal Express
> Corp.*, 777 F.2d 1155, 1158-59 (6th Cir. 1985) ("Front pay is . . . simply
> compensation for the post-judgment effects of past discrimination." It
> is awarded "to effectuate fully the 'make whole' purposes of Title VII");
> *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1066 (8th Cir.
> 1988) (stating that front pay was appropriate given substantial animosity
> between parties where "the parties' relationship was not likely to
> improve, and the nature of the business required a high degree of mutual
> trust and confidence"); *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d, at
> 957 (upholding award of front pay where continuing hostility existed
> between the parties); *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338,
> 1347 (9th Cir. 1987) (same). By 1991, virtually all of the courts of
> appeals had recognized that "front pay" was a remedy authorized under
> § 706(g).  In fact, no court of appeals appears to have ever held to the
> contrary.

*Pollard*, 532 U.S. at 850-51 (emphasis added) (footnote omitted).  Likewise, the

Eleventh Circuit has discussed the district court's mandate to consider front pay as

an alternative to reinstatement in Title VII actions:

> As an alternative to reinstatement, the court could have ordered front
> pay. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 358 (5th
> Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S. Ct. 767, 54 L. Ed. 2d 781
> (1978).  *See also Thompson v. Sawyer*, 678 F.2d 257, 292 (D.C. Cir.
> 1982); *Fitzgerald v. Sirloin Stockade Inc.*, 624 F.2d 945 (10th Cir.
> 1980).  On remand, the court also should consider this option.  In doing
> so, the court must bear in mind that awards of front pay, like other relief
> under Title VII, must be fashioned in a manner to "further the goals of
> ending illegal discrimination and rectifying the harm it causes."
> *Thompson v. Sawyer*, 678 F.2d at 292.

*Nord*, 758 F.2d at 1473-74 (footnote omitted).

Unlike an award of backpay, which is measured "from the date of the unlawful employment action to the date of trial," an award of front pay relates to "an amount of money awarded <u>after trial</u> in lieu of, or until, reinstatement." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1162 n.31 (11th Cir. 2002) (emphasis added). Moreover, unlike claims for compensatory damages, which are determined by the jury, "[f]ront pay, like reinstatement, is a form of equitable relief which is <u>determined by the court</u>." *Id.* (emphasis added) (citing *Pollard*, 532 U.S. at 847-48); *see also W&O, Inc.,* 213 F.3d at 619 (reaffirming "the principle that front pay is an equitable remedy awarded at the discretion of the district court").

Because front pay is the monetary equivalent of reinstatement, it must be limited to the date on which the plaintiff attained her "rightful place," *i.e.*, the position she would have been in but for the discrimination. *James*, 559 F.2d at 358; *E.E.O.C. v. Joe's Stone Crab, Inc*., 15 F. Supp. 2d 1364, 1380 (S.D. Fla. 1998); *see also Lewis*, 953 F.2d at 1282 n.2 (Tjoflat, J. dissenting in part) (noting that "the amount of damages recovered may be mitigated by claimant's new employment").

### D.   Front Pay Analysis

In this case, the parties widely disagree on the amount of front pay to be awarded.  Plaintiff requests a total of $650,886.40 for 32 years of lost wages and benefits (Doc. 206 at 17); Defendant's response indicates that an appropriate amount

is zero based on its theory of unclean hands, or, alternatively, that Plaintiff should only be permitted to recover "the present value of three years' of Plaintiff's lost wages and benefits." (Doc. 212 at 11).

### 1.   Doctrine of "Unclean Hands"

At the outset, the Court must resolve the issue of whether the doctrine of "unclean hands" has any application to equitable relief pursued in  Title VII actions. The Commission argues that Ms. Warren's request for equitable relief in the form of front pay is completely barred by the doctrine of unclean hands, citing *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995) and *Wallace v. Dunn Construction Co.*, 62 F.3d 374, 378-80 (11th Cir. 1995) (en banc).  Ms. Warren posits that the Commission's position is "a clear misstatement of the law under Title VII," and suggests that the Commission "erroneously confuses the 'unclean hands' equitable common law doctrine with the judicially created 'after-acquired evidence' rule."[8]  (Doc. 218 at 2, 4).

First, the Court agrees with Ms. Warren that the Commission has misstated the

---

[8]  The *McKennon* case that the Commission primarily relies on to develop its "unclean hands" argument announces a rule more aptly described as the "after-acquired evidence" rule, as Ms. Warren suggests.  However, the Court in *McKennon* discussed the after-acquired evidence rule in the context of "[e]quity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of unclean hands."  513 U.S. at 360.  Therefore, the Commission's "confusion" is not so significant as Ms. Warren suggests.

law only insofar as it has understated the holding of *McKennon*.  The Commission

posits that *McKennon* holds "that a plaintiff whose misconduct would have resulted

in termination is not entitled to reinstatement or front pay."  (Doc. 212 at 2).  The

Commission is partly correct on that point. The Eleventh Circuit, sitting en banc,

described the *McKennon* holding as follows:

> In *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.
> Ct. 879, 130 L. Ed. 2d 852 (1995), a case involving an alleged violation
> of the Age Discrimination in Employment Act of 1967 ("ADEA"), the
> Supreme Court held that after-acquired evidence of wrongful conduct
> during employment that would have resulted in termination does not
> "operate[ ], in every instance, to bar all relief for an earlier violation of
> the Act." *Id.* at [358], 115 S. Ct. at 884. The Court held, however, that
> "the after-acquired evidence of the employee's wrongdoing bears on the
> specific remedy to be ordered." *Id.* at [360], 115 S. Ct. at 885. <u>The</u>
> <u>Court determined that in cases in which an employee commits an act</u>
> <u>during employment that would lead to termination and the employer</u>
> <u>finds out about the act during the course of litigation, "neither</u>
> <u>reinstatement nor front pay is an appropriate remedy."</u> *Id.* at [362], 115
> S. Ct. at 886.

*Wallace*, 62 F.3d at 378 (emphasis added).[9]  While *McKennon* thus stands for the

principle that later-discovered misconduct of a plaintiff can serve, in certain

instances, to bar that plaintiff's recovery of front pay, Defendant misses a critical step

in the *McKennon* analysis: the after-acquired evidence of wrongdoing must "have led

---

[9] Although *McKennon* was an ADEA case, the Eleventh Circuit in *Wallace* held that it applied with equal force to Title VII actions. *Wallace*, 62 F.3d at 378 ("Based upon the similarities among the statutes, we conclude that the holding of *McKennon* is applicable to claims brought under Title VII and the Equal Pay Act.").

to termination <u>on legitimate grounds</u> had the employer known about it." *McKennon,*

513 U.S. at 362.  The Court stated in *McKennon*:

> Where an employer seeks to rely upon after-acquired evidence of wrongdoing, <u>it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge</u>.

*Id.* at 363 (emphasis added).

Here, the Commission's accusation of Ms. Warren's wrongdoing involves "undisputed evidence [that] shows that [she] did not have a reasonable, good faith belief for filing her EEOC charge."  (Doc. 212 at 4).  To support its assertion, the Commission cites to its own brief in support of its motion for summary judgment (doc. 129 at 24-27)—a motion that this Court ultimately denied.  (Memo. Op., Doc. 176).  The Commission's failed argument on summary judgment, needless to say, does not count as "undisputed evidence" establishing the fact that Ms. Warren lacked a good faith basis to file her EEOC charge.  Further, as Ms. Warren points out, the Commission introduced no evidence at trial to support its late-raised accusation of unclean hands; to the contrary, Ms. Warren provided sufficient testimony and documentation at trial to establish that she *did* file her EEOC charge in good faith. (Doc. 230-2 at 7-9 (citing trial testimony)).

Moreover, *even if* the Commission proved that Ms. Warren filed her EEOC

charge in bad faith, that alone would not constitute "legitimate grounds" for her termination. *McKennon*, 513 U.S. at 362. Ms. Warren rightly explains that under the binding precedent of *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1107 (5th Cir. 1969), she was protected from retaliatory discharge irrespective of whether her charge was filed in good faith.[10] Thus, the Commission has not "establish[ed] that the [alleged] wrongdoing was of such severity that [Ms. Warren] in fact would have been [lawfully] terminated on those grounds alone if the [Commission] had known of it at the time of the discharge." *McKennon*, 513 U.S. at 363.

In sum, the Commission's position that *McKennon*'s after-acquired evidence of wrongdoing principle applies to bar Ms. Warren's recovery of front pay in this case is wholly unsupported. Without any legal or factual support, the Court will not

---

[10]   In *Pettway*, the Court discussed the impact of certain "malicious material" contained in an EEOC charge and held, in relevant part:

> We hold that where, disregarding the malicious material contained in a[n EEOC] charge (or petition for reconsideration, or other communication with EEOC sufficient for EEOC purposes, or in a proceeding before EEOC) the charge otherwise satisfies the liberal requirements of a charge, the charging party is exercising a protected right under the Act. He may not be discharged for such writing. The employer may not take it on itself to determine the correctness or consequences of it. Nor may the court either sustain any employer disciplinary action or deny relief because of the presence of such malicious material.

*Pettway*, 411 F.2d at 1107 (footnotes omitted).

18

entertain the Commission's unclean hands theory.[11]

   2. <u>Expert Economic Testimony</u>

  Another issue raised by the parties is the relevance of expert economic testimony to support an award of front pay.  The Commission suggests that Ms. Warren has not proven her requested amount of front pay damages because she failed to "put forth any expert economic testimony to support her calculations as to either lost wages or lost benefits." (Doc. 212 at 5).  Ms. Warren correctly observes that the Commission "offers no authority, binding or persuasive, that a plaintiff seeking a front pay award is required to provide expert testimony on that issue." (Doc. 230-2 at 16).  Nor has the Commission "offered any expert testimony discrediting [Ms. Warren]'s submission regarding lost future pay and benefits." (*Id.* at 16 n.4).

  The two authorities cited by the Commission do not support its intimation that expert testimony is required.  First, in *Virgo v. Riviera Beach Assoc., Ltd.,* 30 F.3d 1350 (11th Cir. 1994), the district court relied on expert testimony that the plaintiff had presented at trial concerning all her damages, including front pay, but nothing in the Eleventh Circuit's opinion affirming the decision indicates that such expert testimony was necessary or required.  *Id.* at 1364.  Second, the Eleventh Circuit's

---

[11] In light of this conclusion, the Court need not consider Ms. Warren's multiple alternative arguments as to why the unclean hands doctrine should not apply.

Supplemental Pattern Jury Instruction 5.1 is irrelevant to an award of front pay under Title VII because the Eleventh Circuit has <u>expressly held</u> that this form of equitable relief is <u>not subject to a jury's determination</u>, but rather is for the court to decide.  See discussion *supra* (citing *Brochu*, 304 F.3d at 1162 n.31 ("Front pay, like reinstatement, is a form of equitable relief which is <u>determined by the court</u>." (emphasis added)); *W&O, Inc.,* 213 F.3d at 619 (reaffirming "the principle that front pay is an equitable remedy awarded at the discretion of the district court").[12]

Moreover, the Commission does not challenge the amount ($20,340.20 annually) of lost future pay and benefits established by Ms. Warren.  For all these reasons, expert testimony in this case is unnecessary.

### 3.   Application of Front Pay Factors

"The plaintiff bears the initial burden of providing the district court 'with the essential data necessary to calculate a reasonably certain front pay award,' including 'the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate.'"  *Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C. Cir. 1995) (quoting *McKnight v. General Motors Corp*., 973 F.2d 1366, 1372 (7th Cir. 1992)).  Thereafter, "[t]he defendant remains free to challenge

---

[12]  Even if the pattern jury instruction applied to front pay, it does not indicate that expert testimony is necessary or required.

the award's amount, length, or interest rate, or to establish as an affirmative defense that the plaintiff failed to mitigate damages." *Id.* at 1279-80.

> In making a front pay determination, the court will examine factors such as the availability of employment opportunities, the period within which one by reasonable efforts may be reemployed, the employee's work and life expectancy, and other facts that are pertinent to prospective damage awards. The court also may consider such factors as whether plaintiff has reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short, whether the plaintiff intends to work or is physically capable of working, and whether liquidated damages have been awarded.

Am. Jur. 2d *Job Discrimination* § 2641 (citing *Gargano v. Diocese of Rockville Centre*, 888 F. Supp. 1274 (E.D.N.Y. 1995), *aff'd*, 80 F.3d 87 (2d Cir. 1996); *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132 (7th Cir. 1994)); *see also Davoll v. Webb*, 194 F.3d 1116, 1144 (10th Cir. 1999) ("Numerous factors are relevant in assessing front pay including work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which a plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value." (emphasis added)).

Ms. Warren further encourages the Court to consider factors "particular to this employer," such as "the history of employees who worked for Defendant in the Commission office, the lack of equivalent jobs in the community where Plaintiff

resides to the job she held prior to termination and the current economic landscape making finding comparable jobs more difficult." (Doc. 230-1 at 10).

As stated above, the Eleventh Circuit has determined that a district court has wide discretion in fashioning equitable relief (including front pay) in Title VII cases, *Weaver*, 922 F.2d at 1528, and the discretion of the trial judge will not be overturned absent an abuse of discretion. *W&O, Inc.*, 213 F.3d 318-19. Notably, the precise *method* of computing front pay is an open question in the Eleventh Circuit, and thus falls within the discretion of the trial judge.[13] Therefore, the Court looks to other courts for guidance in determining how it should calculate front pay. Federal courts that have addressed computation of front pay generally have done so according to a basic method that accounts for the following:

> an award of front pay often represents "the difference between what the employee would have earned from h[er] former employer and the amount, if any, [s]he could expect to earn from h[er] new employer." [*Hayes v. Trulock*, 51 Wash. App. 795, 802, 755 P.2d 830 (1988)] (citation omitted). Thus, the calculation of front pay may depend upon the interaction of two factors: the period of time the employee would have worked for her former employer but for the wrongful act, and the earnings which the employee can reasonably expect to make from a new employer.

---

[13] And indeed, as other federal courts have observed, "the issue of front pay does not lend itself to a *per se* rule." *Stafford v. Elec. Data Sys. Corp.*, 749 F. Supp. 781, 788 (E.D. Mich.1990) (citing cases).

*Johnson v. Goodyear Tire & Rubber Co.*, 790 F. Supp. 1516, 1529-30 (E.D. Wash. 1992) (emphasis added); *accord Stafford*, 749 F. Supp. at 785 ("[I]n deciding whether to award front pay damages, a court should look to (1) whether reinstatement would be a feasible remedy; (2) what the employee's prospects are for other employment; and (3) how many years remain before the employee would be faced with mandatory retirement." (quotation and citation omitted)).  As the Court has already determined that reinstatement is not a feasible remedy in this case, the Court turns to the remaining factors for computing front pay as articulated in *Johnson* and *Stafford*, considering each factor in turn.

### a.    The Period of Time Ms. Warren Would Have Worked For The Commission But For Her Wrongful Discharge

Ms. Warren reasonably estimates, based on her age of 33, she would have worked for the Commission until her mandatory retirement age of 65.[14]  Thus, she argues that she is entitled to 32 years of front pay.  (Doc. 206 at 17). At trial, Ms. Warren testified that she "loved" her job working for the Commission and that she intended to continue to work for the County until retirement.  (Pl. Testimony on June 14, 2011, Doc. 214 at 102, ll. 10-14).  Thus, Ms. Warren's testimony establishes that

---

[14]    The Court finds that age 65 is a reasonable estimate for mandatory retirement.  *See Stafford*, 749 F. Supp. at 788-89 ("Assuming a retirement age of 65, it can be presumed that Plaintiff has 23 years remaining before retiring.").

23

she is willing and able to continue working until retirement.  Nothing in the record or developed at trial establishes that Ms. Warren has a decreased work/life expectancy.  The Commission does not challenge Ms. Warren's subjective intent to work for the County until retirement, had she not been wrongfully terminated, nor does it refute her projected retirement age.

Further, "[h]istory establishes that employees who work in the Commission offices tend to stay with the County until retirement."  (Doc. 230-1 at 7).  Several examples were detailed during trial testimony, including Linda Harville, who worked for the Commission for more than 30 years; Harville started as Payroll Clerk until she became County Administrator in 2002.  (Pl. Testimony on June 13, 2011, Doc. 213 at 147, ll. 24-25; *id.* at 148, ll. 1-20; Testimony of Bradley Cross on June 14, 2011, Doc. 214 at 202, ll. 2-11).  Similarly, Karen Harrison held the Accountant position for 27 years and "was slated to step into the County Administrator position upon the retirement of Ms. Harville."  (Doc. 230-1 at 7; Pl. Testimony on June 13, 2011, Doc. 213 at 176, ll. 18-25; *id.* at 177, ll. 1-9; Testimony of Bradley Cross on June 14, 2011, Doc. 214 at 202, ll. 12-13).

Another factor the Court considers is the unusually high degree of job stability in the governmental position Ms. Warren occupied with the Commission (Payroll Clerk).  She explains:

24

> The number of employees working in the Lawrence County Commission offices has always been comprised of three individuals – the County Administrator, the Accountant/Grant Administrator, and the Payroll/Accounts Payable Clerk.  There is no basis for suggesting that any of these positions would be eliminated due to some form of downsizing in the future[,] making the permanency of the Payroll Clerk position virtually assured.

(Doc. 230-1 at 7).  The Commission does not refute Ms. Warren's description of the Payroll Clerk position.

Not only was Ms. Warren's position as Payroll Clerk structurally stable, it also presented the demonstrated potential for promotion to the position of County Administrator:

> Moreover, the Defendant has shown a trend that employees who work for the Commission office are selected for the County Administrator position.  Ms. Harville was the Payroll Clerk prior to becoming County Administrator in 2002.  Ms. Harrison was going to replace Ms. Harville after 27 years as the County's Accountant.  Peggy Dawson, who only worked for the Commission in the Accountant position for 3 months, was made County Administrator in late October 2008.  Peggy King was then promoted to County Administrator after working as the Accountant for about 7 months.  It is not speculative to assume that at some point in the future, [Ms. Warren] would have had the opportunity to advance to the County Administrator position.

(Doc. 230-1 at 8).  The demonstrated potential for advancement of Ms. Warren's career, which was developed by the trial testimony of current and former employees, is another appropriate factor for the Court to consider in awarding front pay.  The high likelihood of promotion factors as an incentive for Ms. Warren to have stayed

in the position, and it also highlights the difficulty of finding a comparable replacement position with similar potential for advancement.

In addition to Ms. Warren's trial testimony, the testimony demonstrating the long work histories of other Commission employees, and the uniquely stable and desirable nature of the position, Ms. Warren cites to a number of cases to show that "[l]ong periods for an award of front pay are not unusual when the opportunities for a plaintiff to find an equivalent job are limited": *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir.), *cert. denied*, 506 U.S. 826 (1992) (upholding district court award of 17 years of front pay ($667,000) in ADEA case until employee reached retirement age); *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493 (9th Cir. 2000) (upholding district court award of 22 years of front pay ($2,000,000) to 43-year-old employee terminated for retaliation); *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999) (Kravitch, J., sitting by designation) (upholding district court award of front pay ($603,928.37) to employee for payment until mandatory retirement age of 70); *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117 (2d Cir. 1996) (upholding front pay award of over 20 years until retirement age of 67); *Picinich v. United Parcel Service*, 583 F. Supp. 2d 336 (N.D.N.Y. 2008), *aff'd*, Fed. App'x 34 (2d Cir. 2009) (awarding front pay ($1,218,314.99) until plaintiff reached age 65).  (Doc. 206 at 15-16).

The Commission attempts to discredit these cases (doc. 212 at 7-8), but the Court finds them persuasive to illustrate Ms. Warren's basic point that a longer period of front pay is merited in this case based on the unique and inherent difficulties she faces in obtaining comparable alternate employment, as the Court will discuss further. Moreover, the Commission patently mischaracterizes the holding of the single case it cites "in contrast" to the cases cited by Ms. Warren.  The Commission states that "the Eleventh Circuit has held that awarding a plaintiff front pay until the date of retirement is only appropriate in cases when a plaintiff is close to retirement," citing *Muñoz v. Oceanside Resorts, Inc.*, 223 F.3d 1349 (11th Cir. 2000).  (Doc. 212 at 8). However, *Muñoz* (an ADEA case) makes no such holding.[15]

---

[15]  In relevant part, the *Muñoz* opinion provides:

The district court enjoys wide discretion in selecting which remedy to impose against an employer found liable under the ADEA, and this court will not modify the remedial package absent an abuse of that discretion. . . . Here, the district court opted to award Muñoz $22,449.80 in front pay.

The Resort contends that the front pay award was inappropriate because of its speculative nature. It points out that the only assurance the district court received that Muñoz would have continued in his position had he not been terminated was Muñoz's own testimony, in which he stated an intent to remain employed until the age of seventy. Muñoz's intent, the Resort argues, was an insufficient basis for awarding front pay. As we have observed, however, "awarding prospective relief involves some risk of uncertainty, but that in itself does not preclude an award of such relief. [After all, d]istrict courts have had considerable experience with damages for future wages" in other contexts. *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir.1988) (internal quotation omitted). Moreover, when age discrimination plaintiffs are near the age of retirement, this court has signaled its comfort with awarding front pay. In *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1280 (11th Cir.1992), this court cited with approval *Blum v. Witco*

The Commission argues, <u>without citation to any legal authority</u>, that Ms.

Warren's award of front pay should be reduced to three years' worth of present value.

Because the Commission has not adequately supported its position, nor even

informed the Court of what an appropriate dollar figure would be according to such

a reduction, the Court is not persuaded to adopt its underdeveloped position. *See*

*Flanigan's Enters., Inc. v. Fulton Cnty., Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001)

(holding that a party waives an argument if the party "fail[s] to elaborate or provide

any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d

1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to

authority is insufficient to raise an issue before the court).

The Commission's only apparent basis for suggesting that Ms. Warren's award

--------

*Chemical Corp.*, 829 F.2d 367, 376 (3d Cir.1987), in which the Third Circuit held that awarding front pay to plaintiffs within eight years of normal retirement age did not require unreasonable speculation. At the time of his termination, Muñoz, after being employed by the Resort for twenty-seven years, was within six years of retirement; at the close of trial, he was but one year away. We conclude that <u>under these circumstances</u>, awarding Muñoz one year's worth of front pay was not an abuse of the district court's discretion.

*Id.* at 1349 (emphasis added). As shown, the facts and circumstances of this case are vastly different from the instant case. Notably, Ms. Warren has presented much more than subjective testimony of her intent to have continued in her position until retirement. Additionally, the Eleventh Circuit in *Muñoz* recognized the case-specific nature of front pay analysis, and made no blanket statements about the appropriateness of front pay only in certain circumstances, such as proximity to retirementñ To the contrary, *Muñoz* encourages district courts to consider the unique facts and circumstances of each particular case in accordance with the court's "wide discretion" to select an appropriate remedy.

of front pay be reduced to three years is that the term of the current Commissioners

and County Administrator will expire in 2014.  The Commission posits that "it is not

uncommon for new legislative bodies to make significant changes in the structure of

government entities, the identity of personnel, and the terms and conditions of their

employment." (Doc. 212 at 11).  The Court does not accept the Commission's overly

generalized and conclusive speculation, which is totally unsupported.  Moreover, the

Commission's conjecture "directly contradicts the history of Lawrence County":

> Linda Harville and Karen Harrison worked for the Commission office respectively for 30 years and 27 years. **(Plaintiff's Testimony on June 13, 2011, Document No. 213, at p. 147, lns. 24-25; p. 148, lns. 1-20; Testimony of Bradley Cross on June 14, 2011, Document No. 214, at p. 202, lns. 2-13.)**  That means, at a minimum, 7 different four-year elections for Commissioners took place during Ms. Harville's and Ms. Harrison's employment **and neither employee was terminated.**  In fact, after the election that placed Whitlow, LouAllen and Terry on the Commission in 2006, neither Ms. Harville nor Ms. Harrison was immediately replaced.   Further, in October 2010, the current Commission (which had four new Commissioners) did not replace any Commission office employees.

(Doc. 230, Ex. B at 21-22) (emphasis in original).   From this perspective, the

Commission asks the Court to reduce the number of years for Ms. Warren's front pay

calculation "based upon an event that has never occurred – the turnover of office

employees after an election."  (*Id.* at 22).  The Court will not reduce the number of

years calculated into Ms. Warren's front pay award based on the Commission's

unfounded speculation.

    **b.**    **The Earnings Ms. Warren Can Reasonably Expect to Make From a New Employer**

This factor causes the Court to consider the plaintiff's prospects for obtaining re-employment, including her chances of finding reasonably available employment opportunities. As discussed above, an award of front pay "may be mitigated by claimant's new employment." *Lewis*, 953 F.2d at 1282 n.2 (Tjoflat, J. dissenting in part). Here, the record developed at trial clearly demonstrates that Ms. Warren made a diligent effort to mitigate her damages, demonstrated by immediate action to secure other employment at a gas station with substantially less pay and no benefits, and her continued active job search, which eventually resulted in her current employment as a Patient Account Representative for a medical center.[16] Ms. Warren thoroughly reiterates her mitigation efforts, including the position she finally obtained, in her Motion for Equitable Relief. (*See* Doc. 230-1 at 5-6 (pinciting trial testimony), 10-15 (same); *see also* Doc. 230-2 at 22-23). Notably, the Commission does not challenge Ms. Warren's mitigation efforts, which she has factored into her front pay calculations.

---

[16] Ms. Warren explains that in her current position, she "does not perform any accounting work, any payroll work, or any accounts payable work for her employer." (Doc. 230-2 at 22). Accordingly, "[t]his position is not comparable in duties, pay or benefits to the position [she] held with Lawrence County." (*Id.*).

Several factors have impacted Ms. Warren's ability to find, and maintain, comparable employment in Lawrence County.  In fact, Ms. Warren's efforts to start a new position at a bank were quickly thwarted in connection with the Commission.

> [Ms. Warren] diligently continued to seek better employment opportunities and eventually was hired by Bank Independent, a locally owned financial institution.  (**Plaintiff's Testimony on June 14, 2011, Document No. 214, at p. 91, lns. 19-25; p. 92, lns. 1-5.**)  However, Plaintiff was termination from that position <u>after only 3 hours of employment</u> due to what the President of the bank considered to be a "conflict of interest" with the Lawrence County Commission because the bank maintained several accounts with the Commission.  (***Id.* at p. 92, lns. 6-21.**) [Ms. Warren] then went back to her job at the gas station.  (***Id.* at p. 92, lns. 22-25.**)

(Doc. 230-1 at 5) (emphasis added).

> Additionally, Plaintiff had to endure the retaliatory conduct of Defendant while the actions taken against Plaintiff were played out publicly at Commission meetings and reported in the local newspapers.  (**Plaintiff's Testimony on June 14, 2011, Document No. 214, at p. 100, lns. 3-22.**)  This publicity impacted Plaintiff's emotional well-being and was directly related to difficulties Plaintiff had in finding and keeping new employment.  (***Id.* at p. 90, lns. 19-25; p. 91, lns. 1-25; p. 92, lns. 1-25; p. 93, lns. 1-6.**)

(Doc. 230, Ex. B at 14).  Thus, the retaliatory actions of the Commission coupled with the negative publicity from the trial in this case have proven that it is virtually impossible for Ms. Warren to find comparable local employment.[17]  Her potential to

---

[17]  As demonstration of continued negative publicity Ms. Warren submitted an article from her local newspaper that even related to the briefing on this Motion for Equitable Relief, which insinuates (based on the Commission's Response) that she committed some "reprehensible

find an available job that would restore her to a position equivalent to the one she rightfully occupied prior to the Commission's unlawful termination is further complicated by the nature of small town in which she lives and the downtrodden economy.  (See Doc. 230-1 at 6-7 (citing evidence of the current 10.5 percent unemployment rate in Lawrence County, which exceeds the state's unemployment rate by one percent)).  Ms. Warren's employment options are thus constrained by geographic, economic, and political factors beyond her control—factors which cannot be overcome by even the most diligent mitigation efforts.  The Court finds that Ms. Warren's current position, earning $11.25 per hour, is the most "[s]he could expect to earn from h[er] new employer." *Johnson*, 790 F. Supp. at 1529 (quotation marks and citation omitted).

Ms. Warren provides a detailed analysis that demonstrates the appropriate amount of front pay she is entitled to, which she suggests totals $20,340.20 per year. This figure represents $15,228.20 per year in lost wages plus $5,112.00 per year in lost benefits, which account for the appropriate offsets due to her mitigation efforts.[18]

---

conduct."  (Doc. 230-2, Ex. A).  The Court finds that this example only seeks to reinforce the need for equitable relief to be granted in this case in order to make the plaintiff whole, given the predictable difficulties she is likely to continue to face in seeking comparable local employment.

[18] Ms. Warren's computation for lost wages properly offsets her current earnings of $11.25 per hour, as well as the cost differential between her current insurance coverage plan and the plan she was under while employed by the County, which was significantly superior.

The Commission does not challenge Ms. Warren's methods of computation, which are well-reasoned and amply supported by the evidence presented at trial. Accordingly, the Court finds that the annual amount of front pay Ms. Warren requests is reasonable and just.[19]

Further, Ms. Warren explains that because her front pay calculation does not factor in any future increases in pay or cost of living increases, the award does not have to be discounted to present value.  (Doc. 218 at 22-23 (citing *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 882 (2d Cir. 1997)).  This method of calculating front pay is known as the "total offset method" or the "Alaska Rule."  *See Jones & Laughlin Steel Corp v. Pfeifer*, 462 U.S. 523, 544-46 (1983) (generally discussing, without applying, different approaches to the offset method used by courts in various contexts); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1361 (6th Cir. 1994) ("A reasonable approximation of [front pay] can be obtained by simply multiplying [the plaintiff's] present salary by [the expected number of years the plaintiff would work] and neither including future pay raises nor applying a discount rate. This approach, in fact, has been much discussed and is known as the

---

[19]   Additionally, it is worth noting that Ms. Warren's method of front pay computation does not incorporate other traditionally inclusive front pay factors, such as pension benefits, stock options, or annual cost-of-living increases. *Cf. Virgo*, 30 F. 3d at 1364 (affirming a three percent cost of living adjustment for each year of front pay awarded); *Stafford*, 749 F. Supp. at 793 (awarding plaintiff an annual percentage of the value of 1,120 shares of stock he would have otherwise been entitled to but for his termination as part of his front pay award).

'Alaska rule' since it was first applied by that state's Supreme Court." (citation omitted)).  The Alaska Rule is based on the economic principle that future pay increases will cancel out market inflation increases.[20]  (Doc. 218 at 23).  Although the Eleventh Circuit has not had occasion to address the total offset method of awarding front pay (i.e., the Alaska Rule), other courts have persuasively applied this method and this Court finds it to be a reasonable method of calculation that is appropriate to this case.[21]  Moreover, the Commission does not cite any contrary legal authority or make any argument that challenges application of the Alaska Rule.

Accordingly, the Court accepts Ms. Warren's well-reasoned projection of her annual front pay earnings in the amount of $20,340.20 per year.

_____

[20]  The Supreme Court in *Pfeifer* explained the rationale of the offset method as follows:

Finally, some courts have applied a number of techniques that have loosely been termed "total offset" methods. What these methods have in common is that they presume that the ideal discount rate-the after-tax market interest rate on a safe investment-is (to a legally tolerable degree of precision) completely offset by certain elements in the ideal computation of the estimated lost stream of future income. They all assume that the effects of future price inflation on wages are part of what offsets the market interest rate.

*Pfeifer*, 462 U.S. at 544.

[21]  Notably, the Eleventh Circuit has not adopted any alternative method for calculating front pay.

### c.   The Commission Has Not Overcome Ms. Warren's Presumptive Entitlement to Front Pay

The Commission does not effectively counter or discredit *any* of Ms. Warren's arguments in support of her request for front pay, which are reasonably developed and amply supported by trial evidence and testimony.   The Commission instead complains that Ms. Warren's request is nothing more than "pure unfounded speculation." (Doc. 212 at 5).  The Court disagrees for the reasons established above.

The bulk of the Commission's arguments are made without citation to *any* supporting authority.   In contesting Ms. Warren's request for front pay through retirement age, for example, the Commission broadly speculates that "<u>one hopes</u> that the economy will improve <u>at some point in the next thirty-two years</u> – which <u>may very well lead</u> to greatly improved opportunities in the job sector," and concludes that "it would be <u>logical to assume</u> that private employment would become more lucrative than public employment at that point."   (Doc. 212 at 6 (emphasis added)).   The Commission's unfounded speculation on this point is far more egregious than any potential speculation it blames on Ms. Warren.

By nature, the remedy of front pay necessarily involves some measure of speculation.  However, as Judge Proctor rightly noted, that aspect of the remedy does not *preclude* an award of front pay:

> [T]he court notes that it is axiomatic that awarding prospective relief involves some risk of uncertainty. However, the speculative nature of front pay does not preclude such an award. "'District courts have had considerable experience with damages for future wages in employment contract and personal injury cases, . . . as well as front pay cases under Title VII.'" *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1552 (11th Cir. 1988) (quoting *Whittlesey v. Union Carbide Corp.*, 742 F.2d, 724, 728 (2d Cir. 1984)).

*Tucker v. Hous. Auth. of the Birmingham Dist.*, Case No. 01-CV-2038-RDP, Doc. 224 at 2 n.1 (N.D. Ala. Aug. 2, 2006).

Based on this Court's observation of all the trial testimony and evidence presented in this case, the Court finds that Ms. Warren is entitled to front pay until her projected retirement age based on all the factors discussed above.  Further, the Court finds that $650,886.40 represents a "reasonably certain" front pay award based on the detailed data and calculations provided by Ms. Warren. *Barbour*, 48 F.3d at 1279. The Court has carefully fashioned this equitable relief to afford Ms. Warren the "most complete relief possible" and to accomplish Title VII's remedial purpose of making the plaintiff "whole," i.e., restoring her to the economic position she would have held but for the Commission's illegal discrimination. *Weaver*, 922 F.2d at 1528.

Accordingly, the Court finds that Ms. Warren's Motion for Equitable Relief is due to be **GRANTED** in full, and she is entitled to an award of front pay in the amount of **$650,886.40**.

## IV.   CONCLUSION

For these reasons, the Court concludes that the Commission's the Motion for New Trial is due to be **DENIED IN PART** to the extent it seeks a new trial and **GRANTED IN PART** to the extent it alternatively seeks remittitur pursuant to the mandatory statutory cap.  Further, Ms. Warren's Motion for Equitable Relief is due to be **GRANTED** in its entirety. A separate Final Judgment Order will be entered.

**DONE** and **ORDERED** this the 1st day of December, 2011.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

37